IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>      v.<br>[1] ARTHUR W. RODRIGUEZ-SANCHEZ,<br>  ET AL.,<br>Defendants. | Crim. No. 23-053(ADC) |

## **MEMORANDUM IN SUPPORT OF DETENTION**

### **INTRODUCTION**

The United States respectfully submits this memorandum in support of its application for a pretrial order of detention for defendant [1] Arthur W. Rodriguez-Sanchez (defendant), who is a member, organizer and leader of a drug trafficking organization based in the Dominican Republic, Puerto Rico, the United States Virgin Islands and the British Virgin Islands (the DTO), responsible for importing and conspiring to import thousands of kilograms of cocaine into the United States.  The United States is also seeking pretrial orders of detention for an additional 18 co-defendants who are organizers, leaders or members the drug trafficking organization, as detailed below.

The defendant, as well as 18 co-defendants in the case, were sought for arrest by federal authorities in Puerto Rico, the United States Virgin Islands, and Alaska on February 21, 2023. Some members of the DTO are currently in the Dominican Republic and Colombia.  For those arrested in Puerto Rico, they are scheduled to appear before the Court today for purposes of their Initial Appearances.  *See* ECF No. 1 (the Indictment). For the reasons set forth below, at their Initial Appearance and Arraignment, the Court should enter pretrial

orders of detention, as no conditions or combination of conditions can assure the safety of the public or the defendant's appearances at trial. Thus, pursuant to 18 U.S.C. § 3142(e), the defendants' detention pending trial is justified.

## DISCUSSION

### I.    THE CHARGES

On February 16, 2023, a federal grand jury sitting in the District of Puerto Rico returned the Indictment—charging the defendant and 23 co-defendants with: (1) Conspiracy to Possess with Intent to Distribute a Cocaine Aboard a Vessel Subject to the Jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), and 70506(b); (2) Conspiracy to Import Cocaine into the United States in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(1)(B)(ii), 963; (3) Importation of Cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(1)(B)(ii), and 18 U.S.C. § 2;  963; (4) Conspiracy to Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii), and 846; and (4) Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. 1956(a)(1), (a)(2), and 1956(h).

If convicted of Count One or Count Two alone, the defendants face a mandatory minimum sentence of ten-years of imprisonment with a maximum sentence of life imprisonment.

### II.    THE DRUG TRAFFICKING ORGANIZATION ("DTO")

The DTO's primary focus was to coordinate and facilitate the maritime importation of thousands of kilograms of cocaine from outside of the United States and the customs territory of the United States, including Colombia, Venezuela, the British Virgin Islands, the United States Virgin Islands and elsewhere, into Puerto Rico, and to distribute the cocaine in

Puerto Rico and the continental United States, all for significant financial gain and profit.

The DTO employed multiple manners and means by which they made the DTO's operations successful, including but not limited to, the following:

1. The DTO would employ a network of multiple international cocaine suppliers to coordinate with boat captains and crew members, recruiters, coordinators, facilitators, and loading and unloading crews to obtain cocaine for widespread wholesale distribution in Puerto Rico and the continental United States.

2. The DTO members would conspire to fund, coordinate, and facilitate the transportation and maritime importation of thousands of kilograms of cocaine into Puerto Rico. Once the cocaine arrived in Puerto Rico, part of the cocaine was further distributed to other local DTOs while other quantities were sent to the continental United States via mail or drug couriers.

3. DTO members used navigating techniques to avoid detection, such as driving recreational pleasure vessels at high rates of speed to gain the attention of law enforcement. While doing this, the DTO would also have other recreational vessels, loaded with cocaine in secret compartments, travel through other routes to bring the cocaine to Puerto Rico successfully. DTO members would build secret compartments in the recreational vessels to conceal the kilograms of cocaine.

4. DTO members would sometimes plan their trips when there were adverse weather conditions in the ocean to avoid detection. When the weather was not optimal for sea travel the DTO would send some of the vessels out to pick up cocaine and bring the cocaine back to Puerto Rico. The DTO would send vessels out during holidays, as there were many recreational vessels out in the ocean traveling during these holidays.

The DTO would also send some of the vessels out during boat show activities, such as the Caribbean International Boat Show. During these types of events, there were many recreational vessels out in the ocean, creating the optimal conditions for the DTO to smuggle cocaine using the vessels.

5. The conspiracy relied on the DTO paying lookouts to obtain information as to the presence of law enforcement officers patrolling the routes between Puerto Rico, the British Virgin Islands and the United States Virgin Islands. The lookouts include a Puerto Rico Police Bureau (PRPB) officer assigned to the PRPB Fuerzas Unida de Rapida Accion (FURA) Division and a taxi driver in the United States Virgin Islands.

6. The DTO would also hire women as part of the DTO to travel with other members to act as decoys and distract the attention of law enforcement. This was done to create the impression that the DTO members were in their recreational vessels for leisurely activities. These recreational vessels would travel in groups. Some of these recreational vessels were carrying the women, while the other vessels were carrying cocaine hidden in secret compartments. Some of these women also acted in furtherance of the drug conspiracy by recruiting other women to be decoys in the vessel trips and to take cocaine to the continental United States as drug couriers.

III.    FACTUAL BASIS IN SUPPORT OF DETENTION

Pursuant to First Circuit precedent, the government proceeds by factual proffer in support of its motion for a pretrial order of detention. *United States v. Acevedo-Ramos*, 755 2d 203, 207-209 (1st Cir. 1985). Our proffer will articulate facts sufficient to justify detention, however, it is not a complete statement of all of the evidence of which the government is

aware or will seek to introduce at trial.  A non-exclusive list of some of the DTO's overacts of the conspiracy are included below.

### DEFENDANT [1] ARTHUR W. RODRIGUEZ-SANCHEZ

In or about October of 2017, defendant and members of the DTO traveled to the United States Virgin Islands by vessel to exchange several pounds of marihuana for approximately 13 kilograms of cocaine.  Subsequently, the DTO members  brought the cocaine to Puerto Rico.

On or about January 16, 2018, defendant delivered approximately 1.5 kilograms of cocaine to a person in California via mail.  Defendant mailed the package containing the cocaine from the United States Virgin Islands.  In relation to this event, defendant is heard on a recorded conversation threatening to kill the person that received the package in California.

In or about the year of 2019, the defendant and other DTO members traveled back to Puerto Rico from the British Virgin Islands in a vessel, acting as decoys since another DTO member was also traveling back to Puerto Rico in another vessel loaded with hundreds of kilograms of cocaine.  During this trip, the DTO was able to smuggle hundreds of kilograms of cocaine into Puerto Rico.  During the same year, the defendant and other DTO members traveled multiple times to the British Virgin Islands to pick up hundreds of kilograms of cocaine in each trip and smuggled them back to Puerto Rico using navigation techniques and decoy vessels to distract law enforcement officers.

On or about August 16, 2020, the defendant and other DTO members met up in Fajardo, Puerto Rico, to coordinate the pick-up of several hundreds of kilograms of cocaine from the British Virgin Islands.  The plan involved navigating two vessels owned by defendant.  During the trip, one of the vessels had mechanical problems on the way to the

British Virgin Islands, becoming dead on the water. The defendant continued the travel in his vessel to the British Virgin Islands, wherein he picked up hundreds of kilograms of cocaine. After picking up the cocaine, defendant met up with other DTO members before arriving to Puerto Rico. The DTO members then switched out vessels, allowing the defendant to act as a decoy in his vessel, without the drugs. The DTO members were able to smuggle the cocaine with the use of the other vessel.

On or about October 27, 2020, defendant is heard on a recorded audio discussing payments with another DTO member. These payments were to be made to the DTO's sources of supply in Colombia, the United States Virgin Islands and the British Virgin Islands.

On or about June 9, 2021, CBP-AMO officers interdicted a vessel traveling from the United States Virgin Islands in route to Puerto Rico. In the vessel, CBP-AMO officers found a DTO member. Due to adverse weather conditions, the vessel was taken to the CBP-AMO grounds in Ceiba, Puerto Rico. A subsequent search of the vessel yielded approximately 517 kilograms of cocaine. The defendant and other DTO members planned and coordinated the importation of the cocaine into Puerto Rico from the United States Virgin Islands.

On or about August 15, 2021, two DTO members were captaining two vessels returning from the United States Virgin Islands and loaded with approximately 250 kilograms of cocaine. This event happened during the Caribbean International Boat Show. The vessels had mechanical problems near Culebra, Puerto Rico and became dead in the water. To rescue the two vessels, defendant purchased another vessel from a DTO member, for $65,000 in cash. Subsequently, the defendant and another DTO member were able to smuggle the cocaine into Puerto Rico.

On or about December 11, 2021, defendant and other DTO members traveled to the United States Virgin Islands to obtain a load of cocaine to smuggle into Puerto Rico (between 250 and 350 kilograms of cocaine).  This trip was organized by the defendant and another leader of the DTO.  The defendant instructed other DTO members to find trusted females that could pose as decoys in the vessels to distract law enforcement.  As part of the planning for the trip, the defendant and other DTO members were in frequent communications with another DTO member, who was also a PRPB FURA Police Officer that acted as a lookout for the DTO.  The DTO also relied on a taxi driver in the United States Virgin Islands that acted as a lookout for the DTO on different occasions.

Due to a last-minute change in plans involving the delivery of the load to Puerto Rico and the presence of law enforcement, some of the DTO members opted for sending part of the drug load via jet skis. Part of the rest of the load of cocaine, which consisted of hundreds of kilograms of cocaine, was not delivered to the rest of the vessels awaiting them. The defendant and other DTO members were also in the United States Virgin Islands in different vessels awaiting the cocaine load to be taken to Puerto Rico.  Thereafter, the defendant transferred a duffle bag to one of the vessels.  The defendant then departed for Puerto Rico first without the drug load to distract law enforcement.

Due to the presence of law enforcement in the route between Puerto Rico and the USVI, the defendant instructed other DTO members not to bring the rest of the drugs to Puerto Rico.  Back in the United States Virgin Islands, other DTO members remained in their respective vessels, while other DTO members, including females, were acting as decoys in another vessel.

On or about January of 2022, a DTO member traveled by vessel to the British Virgin Islands to get approximately 250 kilograms of cocaine on behalf of the defendant. The vessel got stranded in the British Virgin Islands. Subsequently, the defendant arrived in another vessel. The defendant and the other DTO member traveled back to Puerto Rico without picking up the cocaine.

On January 17, 2022, CBP-AMO officers interdicted a vessel near Culebra, Puerto Rico, that was traveling from the United States Virgin Islands. During the interdiction, the CBP-AMO officers seized approximately 305 kilograms of cocaine. CBP-AMO officers arrested two DTO members. The defendant, and other DTO members in Puerto Rico and the United States Virgin Islands, planned and coordinated the importation of the cocaine into Puerto Rico.

During the months of October and November of 2022, the defendant and other DTO members smuggled hundreds of kilograms of cocaine into Puerto Rico in separate events. In one of the events, the defendant personally delivered six kilograms of cocaine. In another event, four DTO members were arrested following a traffic stop. The DTO members had just left one of the defendant's properties in Salinas, Puerto Rico. Puerto Rico Police Bureau Officers found approximately 104 kilograms of cocaine inside the truck in which the DTO members were traveling.

Defendant [2] EMMANUEL RODRIGUEZ-RODRIGUEZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Emmanuel Rodriguez-Rodriguez (Rodriguez-Rodriguez) is identified as one of the DTO's leaders and organizers. Rodriguez-Rodriguez was arrested in December 11, 2021, in

8

the United States Virgin Islands on drug trafficking charges related to some of the DTO's operations. He is currently on conditions of release for the United States Virgin Islands' case. The United States is in possession of evidence linking Rodriguez-Rodriguez to cocaine importation ventures, to include the importation of cocaine in June of 2021. Rodriguez-Rodriguez is also involved in the recruitment of females that act as decoys to distract law enforcement officers during cocaine importation ventures. While on conditions of release, law enforcement officers have received information concerning additional potential illegal activity he has been involved with.

Defendant [3] SMILL E. GOMEZ-DE LA CRUZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Smill E. Gomez-De la Cruz (Gomez-De La Cruz) is identified as one of the DTO's leaders and organizers. Gomez-De La Cruz is the main point of contact for the organization in the United States Virgin Islands. Gomez-De La Cruz has been linked to multiple importation of cocaine ventures coming from the United States Virgin Islands to be distributed in Puerto Rico. Gomez-De La Cruz assisted the DTO with at least three importation ventures: June of 2021, December of 2021 and January of 2022. Per information provided by law enforcement officers, Gomez-De La Cruz is currently involved in the trafficking of multi kilograms of cocaine, to include a recent transaction where he delivered cocaine in the United States Virgin Islands.

9

<u>DEFENDANT [4] RUBEN E. VIDAL-FLORES</u>

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Ruben E. Vidal Flores (Vidal-Flores) is identified as one of the DTO's leaders, organizers and money launderers.  The United States is in possession of evidence indicating that from the early stages of the DTO creation, Vidal-Flores was the main point of contact for the DTO's boat captains for purposes of receiving imported narcotics and to receive the DTO's payments.  Vidal-Flores was also in charge of making sure that payments were made to the DTOs sources of supply in the United States Virgin Islands, the British Virgin Islands, and Colombia.  The United States is in possession of evidence showing that he receives payments from drug transactions and those payments are in turn given to the DTO.  Vidal-Flores is also identified as a well-connected and knowledgeable person in real estate transactions and actively assisted with the DTO's laundering of drug proceeds.

<u>DEFENDANT [6] YAN C. GARCIA-POLA</u>

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Yan C. Garcia-Pola (Garcia-Pola) is also a trusted DTO organizer and member responsible for coordinating drug importation ventures from the United States Virgin Islands. The United States has identified Garcia-Pola as the organizer of cocaine importation venture that took place in June of 2021, wherein approximately 517 kilograms of cocaine were imported into Puerto Rico from the United States Virgin Islands.  He has also participated in the organization of drug importation ventures in 2021 and 2022.  Vessels registered under his

name has been identified as vessels used in prior drug importation vessels as part of the DTO's operations.

DEFENDANT [8] WILFREDO R. VAZQUEZ-LOPEZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Wilfredo Vazquez-Lopez (Vazquez-Lopez) is a member of the DTO, who has been involved in multiple importation drug ventures. Vazquez-Lopez was arrested on December 11, 2021, in the United States Virgin Islands on drug trafficking charges related to some of the DTO operations.  He is currently on conditions of release for the United States Virgin Islands' case.  The United States is in possession of evidence linking Vazquez-Lopez with a shipment of cocaine from the United States Virgin Islands to Puerto Rico in June of 2021.  He was also identified as one of the DTO members involved in the planning of the shipment of hundreds of kilograms of cocaine from the United States Virgin Islands to Puerto Rico in December of 2021.  Vazquez-Lopez is a well trusted DTO member who is closely associated with Rodriguez-Rodriguez, a leader of the DTO.

DEFENDANT [9] JOSE A. AQUINO-PERALES

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Jose A. Aquino-Perales (Aquino-Perales) is a Puerto Rico Police Bureau police officer currently assigned to the PRPB's Fuerzas Unidas de Rapida Accion (FURA) Intelligence Division.  FURA is the principal air and marine unit within the PRPB responsible for enforcing state laws concerning air and maritime activities within the territorial waters of Puerto Rico, to include the interdiction of contraband.  Aquino-Perales is also a member of

11

the DTO, whose principal role was to act as a lookout for the DTO by informing on the status of maritime enforcement in the coast of Puerto Rico, to permit the safe navigation of the vessels loaded with cocaine.  Aquino-Perales was paid for these services.  He also assisted with the upkeep and maintenance of some of the vessels involved in the trafficking of drugs. The United States is in possession of evidence linking Aquino-Perales with cocaine importation ventures spanning the years between 2020 and 2022, including in August of 2020, December of 2021 and January of 2022.

DEFENDANT [10] ALEXIS ABREU-CORDERO

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Alexis Abreu-Cordero (Abreu-Cordero) is a taxi driver in the United States Virgin Islands who is also a point of contact for the members of the DTO when the members of the DTO travel from Puerto Rico to the United States Virgin Islands.  Abreu-Cordero provides transportation services to the DTO members in the United States Virgin Islands, as well as lookout services.  For the lookout services, Abreu-Cordero informs the DTO members of the presence of law enforcement in the vicinity of the area from which the vessels loaded with drugs are to launch from.  He also informs the DTO members if there are any law enforcement vessels in the water patrolling the coast of the United States Virgin Islands.  Abreu-Cordero assisted the DTO with his services on multiple drug importation ventures for which he was paid.

DEFENDANT [12] ANGEL L. HERNANDEZ-DIAZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Angel L. Hernandez-Diaz (Hernandez-Diaz) is a DTO member and trusted bodyguard of Rodriguez-Sanchez. Hernandez-Diaz traveled on multiple occasions to assist Rodriguez-Sanchez to import cocaine into Puerto Rico from the United States Virgin Islands and the British Virgin Islands. The trips began in 2017. The United States is in possession of information indicating that Hernandez-Diaz has received kilograms of cocaine in the state of Florida and that he has connections in the state of Connecticut to move drugs. He was also one of the designated DTO members responsible for the towing out of the water of some of the vessels that arrived in Puerto Rico after picking up cocaine in the United States Virgin Islands and the British Virgin Islands.

DEFENDANT [13] ANGEL L. SANTIAGO-RIVERA

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Angel L. Santiago-Rivera (Santiago-Rivera) is a DTO member and trusted associate of Rodriguez-Sanchez. The United States is in possession of evidence showing that Santiago-Rivera was involved in the DTO's cocaine importation ventures in October and November of 2022. During this period of time, Santiago-Rivera communicated on multiple occasions with other DTO members, including Rodriguez-Sanchez, in furtherance of drug trafficking offenses. Santiago-Rivera is video recorded and photographed at relevant locations of the DTO during the time cocaine importation ventures have been accomplished. Santiago-Rivera has been assisting the DTO in multiple cocaine importation ventures, including an event in which he was arrested in November of 2022, in which the DTO imported approximately 104 kilograms of cocaine. Santiago-Rivera is currently under conditions of release in that case.

DEFENDANT [14] JORGE RODRIGUEZ-FLORES

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Jorge Rodrigue-Flores (Rodriguez-Flores) is a DTO member and trusted associate of Rodriguez-Sanchez.  Rodriguez-Flores has also been working for years for Rodriguez-Sanchez as a boat mechanic.  Rodriguez-Flores assisted with the building of secret compartments for the DTO's vessels, as well the provision of general maintenance services for the vessels.  The drug traffickers hide cocaine inside the vessels for the purpose of importing them from the United States Virgin Islands and the British Virgin Islands. Rodriguez-Flores has been assisting the DTO in multiple cocaine importation ventures, including an event in which he was arrested in November of 2022, in which the DTO imported approximately 104 kilograms of cocaine.  The United States is in possession of evidence indicating that on the date of the event when he was arrested, he was communicating with other DTO members, including Rodriguez-Sanchez. Rodriguez-Flores is video recorded and photographed at relevant locations of the DTO during the time cocaine importation ventures have been accomplished.  Rodriguez-Flores is currently under conditions of release in that case.

DEFENDANT [15] HECTOR ZAYAS-SCHULZE

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Hector Zayas Schulze (Zayas-Schulze) is a DTO member and trusted associate of Rodriguez-Sanchez.  Since at least March of 2022, Zayas-Schultze has been assisting the DTO with the importation and distribution of the cocaine in Puerto Rico.  In November of 2022,

14

Zayas-Schulze and another DTO member were found in possession of approximately 104 kilograms of cocaine, in a drug related case involving the DTO's operations. In the previous months leading to his arrest in November of 2022, Zayas-Schulze was in constant communication with Rodriguez-Sanchez. Zayas-Schulze is currently under conditions of release in that case. The United States is in possession of evidence indicating that Zayas-Schulze is a suspect in the murder of another person who was in conditions of supervised release when the murder took place. The murder took place while Zayas-Schulze was in conditions of release for his November of 2022 arrest.

### DEFENDANT [16] JOSE VELAZQUEZ-MADERA

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Jose Velazquez-Madera (Velazquez-Madera) is a DTO member who has also been working for the DTO since at least the year 2022. In November of 2022, Velazquez-Madera and another DTO member were found in possession of approximately 104 kilograms of cocaine, in a drug related case involving the DTO's operations.

### DEFENDANT [17] KENNETH A. CRUZ-FONTNEZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Kenneth A. Cruz-Fontanez (Cruz-Fontanez) is a DTO member and trusted associate of Rodriguez-Sanchez, who works as runner for the DTO. Between October and November of 2022, Cruz-Fontanez assisted the DTO with two cocaine importation ventures, one which resulted in the arrest of four DTO members related to a 104 kilograms of cocaine seizure. On the dates before the events of November of 2022, Cruz-Fontanez was in constant

15

communication with Rodriguez-Sanchez and other DTO members in furtherance of the DTO's drug trafficking activities. Cruz-Fontanez was kept informed on the status of the building of secret compartments in the DTO's vessels. Since at least the early part of 2022, Cruz-Fontaez has been assisting the DTO with the importation and distribution of the cocaine in Puerto Rico.

DEFENDANT [19] JOSE M. HIDALGO-DUARTE

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Jose M. Hidalgo-Duarte (Hidalgo-Duarte) is a DTO member and trusted associate of who also works as a boat captain for the DTO. Hidalgo-Duarte also travels with Rodriguez-Sanchez to the United States Virgin Islands and the British Virgin Islands to pick up loads of cocaine. In November of 2022, he assisted the DTO with the importation of hundreds of kilograms of cocaine into Puerto Rico. Since at least the early part of 2022, Hidalgo-Duarte has been assisting the DTO with the importation and distribution of the cocaine in Puerto Rico.

DEFENDANT [20] JESUS H. VEGA-RIVERA

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Jesus H. Vega-Rivera (Vega-Rivera) is a DTO member who had sent via mail kilograms of cocaine received from the DTO to the continental United States. Vega-Rivera has participated in meetings with Rodriguez-Sanchez and other DTO members where importation drug ventures were discussed. Vega-Rivera has fronted kilograms of cocaine to

16

the DTO when the DTO was required to distribute kilograms of cocaine to other purchasers and the kilograms of cocaine where not available at the time.

DEFENDANT [21] VERONICA QUESTELL-RODRIGUEZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Veronica Questell-Rodriguez (Questell-Rodriguez) is a DTO member, organizer and recruiter for drug runs by couriers between Puerto Rico and the continental United States. The drug courier trips to the continental United States are via domestic flights. Questell-Rodriguez has also been identified as a recruiter of other females who act as decoys during vessel trips, for which the decoys get paid. Questell-Rodriguez was one of the vessel's occupants where decoys were traveling in an event where the DTO was importing cocaine from the United States Virgin Islands in December of 2021. Questell-Rodriguez provided instructions to the drug couriers and the vessel's decoys on the procedures to be followed while participating in these trips.

DEFENDANT [22] DEYANIRA VELAZQUEZ-ALVAREZ

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above. It also shows the following:

Deyanira Velazquez-Alvarez (Velazquez-Alvarez) is a DTO member, organizer and recruiter for drug runs by couriers between Puerto Rico and the continental United States. The drug courier trips to the continental United States are via domestic flights. Velazquez-Alvarez has also been identified as a recruiter of other females who act as decoys during vessel trips, for which the decoys get paid. Velazquez-Alvarez was one of the vessel's occupants where decoys were traveling in an event where the DTO was importing cocaine from the

17

United States Virgin Islands in December of 2021. Velazquez-Alvarez provided instructions to the drug couriers and the vessel's decoys on the procedures to be followed while participating in these trips.

DEFENDANT [23] KAILYN RIVERA-TORRES

The United States hereby re-alleges and incorporates by reference herewith the DTO's overacts described above.  It also shows the following:

Kailyn Rivera-Torres (Rivera-Torres) is an organizer and recruiter for drug runs by couriers between Puerto Rico and the continental United States.  The drug courier trips to the continental United States are via domestic flights.  Rivera-Torres is a close associate of Questell-Rodriguez in the drug business and the recruitment of drug couriers.  Rivera-Torres would provide instructions to the drug couriers on the procedures to be followed while participating in these trips.

IV.    LEGAL STANDARD

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. *United States v. Contreras*, 776 F.2d 51, 54-55 (2nd Cir. 1985).

18

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3124(e)(3). A defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight.

In other words, if a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by introducing some evidence to the contrary. *See United States v. O'Brien*, 895 F.2d 810, 814-815 (1st Cir. 1990).  The government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk. *United States v. Jackson*, 823 F.2d 4, 5 (2nd Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2nd Cir. 1985).

Detention based on danger to the community must "be supported by clear and convincing evidence." *See* 18 U.S.C. § 3142(f).  The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt.  *See* 18 U.S.C § 3142(g). At a detention hearing, the government may proceed by proffer. *United States v. Acevedo-Ramos*, 755 2d 203, 207-209 (1st Cir. 1985).

19

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of danger." *See United States v. Caraballo*, 47 F. Supp.2d 190, 191-193 (D.P.R. March 29, 1999) (quoting *United States v. Leon*, 766 F.2d 77, 81 [2nd Cir. 1985]). In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable incentive to flee," *United States v. Millan*, 4 F.3d 1038, 1046 (2d Cir. 1993), as does the possibility of a severe sentence, *see United States v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987); *United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

The First Circuit has recognized that drug trafficking also poses specials concerns regarding risk of flight. *United States v. Palmer-Contreras*, 835 F 2d 15, 17 (1st Cir. 1987)("drug traffickers pose special flight risks"). The First Circuit in recognizing the presumption's application in drug cases with large amounts of kilograms found:

> Pointing to their strong family ties to Puerto Rico, their meager financial resources, the absence of any prior drug related arrests or convictions, and their minor roles as mules, defendants contend that the district court misapplied § 3142(e)'s presumption and concluded that mere possession of drugs is sufficient ground for detention. We disagree with defendants' interpretation of the district court's detention order. This is no ordinary drug case. Rather, defendants were caught with 195 kilos of cocaine valued at $37,000 to $40,000 per kilo, that is to say, over $7 million worth of cocaine. The large amount of drugs supports the court's inference (for detention purposes) that defendants are connected to persons or an organization with great financial resources, an organization which could finance defendants' relocation. The forfeiture of $100,000 worth of property would have little financial impact on such an organization. In other

20

words, defendants or the persons with whom they are associated would appear to be involved in the " 'highly lucrative' drug operations at the center of congressional concern" and thus be persons at whom the § 3142(e) presumption is aimed. *Jessup*, 757 F.2d at 386. If, indeed, as the district court concluded, the evidence against defendants is strong, the incentive for relocation is increased.

*Id* at 18.

## V.    THE DEFENDANTS SHOULD BE DETAINED PENDING TRIAL

DEFENDANT [1] ARTHUR W. RODRIGUEZ-SANCHEZ

### A. A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3). Specifically, because the defendant is charged with multiple counts under the Controlled Substances Act and the Controlled Substances Important and Export Act for which the maximum term of imprisonment is life, he is presumed to pose a danger to the community and a risk of flight. Accordingly, the defendant bears the initial burden of showing that he is not a danger to the community or a flight risk. For the reasons set forth below, the defendant cannot sustain that burden.

### B. The Defendant Is a Danger to the Community

### 1. The Nature and Circumstances of the Offenses Charged

21

As detailed above, the defendant is a high-level member in an organization responsible for thousands of kilograms of cocaine, a controlled substance which causes thousands of deaths each year.[1] The defendant oversees a cocaine distribution infrastructure in Puerto Rico that brings cocaine from foreign countries, to be further distributed in Puerto Rico and the continental United States, for substantial financial gains. the conduct with which the defendant is charged—participating in an international drug trafficking organization—are among the most serious offenses contemplated by the federal criminal justice system. For these crimes, the defendant faces a 10-year mandatory minimum up to life imprisonment. *See* 21 U.S.C. § 960(b)(1)(B)(ii). Such a sentence creates a powerful incentive for the defendant to flee should he be released on bond, confirming that the defendant is a serious risk of flight. When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure the defendants' appearances. *See*, *e.g.*, *United States v. English*, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); *Jackson*, 823 F.2d at 7; Martir, 782, 8 F.2d at 1147; *United States v. Henderson*, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order)

Moreover, and as described above, the defendant and the DTO members furthered their international narcotrafficking operations through corruption and the use of lookouts and a member of law enforcement to circumvent law enforcement security and customs measures both domestic and abroad. This behavior depicts individuals who have the experience and ability to thwart government and law enforcement efforts to disrupt criminal activity— individuals who have no respect for the public authority and the rule of law. Thus, there is no

---

[1] https://nida.nih.gov/drug-topics/trends-statistics/overdose-death-rates (retrieved April 26, 2022)("Drug overdose deaths involving cocaine rose steadily from 5,419 to 19,477 in 2020")

reason to believe that the defendant would obey the Court's orders or conditions of release if bail was granted, and the nature and circumstances of the charged offenses justify detaining the defendant.

2.  The Weight of the Evidence

The evidence of defendant's guilt is overwhelming. His arrest and the arrest of the DTO members come at the end of an extensive investigation conducted by U.S. law enforcement agencies. The evidence supporting the charges against the defendant includes, among other things: (a) photographs, audio and video messages and communications recovered from numerous cellular telephones linking the defendant to the DTO members and the DTO operations; evidence establishing their roles within the organization, as described above—such materials include discussions of, among other things, (i) cocaine shipment quantities, concealment methods, pricing and profit sharing, (ii) costs of the DTO operations, (iii) the use of lookouts, including a police officer, (iv) recruitment and instruction of drug couriers, and (v) laundering drug proceeds; (vi) evidence of cocaine shipments smuggled into Puerto Rico; (vii) evidence of payments and transfers of thousands of dollars of drug trafficking proceeds and moneys used and intended to be used to invest in cocaine shipments in furtherance of the DTO's operations; (viii) multiple seizures of cocaine during the period of the conspiracy; (ix) seizure of thousands of dollars in cash proceeds of sales of cocaine that were to be laundered by the DTO; and (x) one or more confidential informants and/or cooperating witnesses who are familiar with the defendant and other DTO members' roles within the organization and have direct knowledge of their participation in the charged crimes.

3.  The History and Characteristics of the Defendant

    a.  Defendant's Threats to Others

While the defendant does not have a criminal history, the investigation has uncovered evidence that he is willing to kill a person who does not follow his instructions.  This evidence was obtained through a recorded telephone call secured by authorities during the investigation.  The investigation has also revealed that after some of his boat captains have been arrested, he has attempted to contact them through associates, friends or relatives.  There is also evidence of him threatening at least one arrested boat captain.  Additionally, there is overwhelming evidence against the defendant showing the DTO's efforts to subvert law enforcement officers both domestically and internationally.

4.  The Nature and Seriousness of the Danger Posed by Release

The facts and circumstances of this case compel the defendant's detention, as the factors set forth in the Bail Reform Act show that his criminal activity and narcotics trafficking poses a danger to the community. The defendant and his DTO engaged in international narcotrafficking for years. The DTO was responsible for the movement of millions of dollars' worth of dangerous drugs, and actively corrupted and evaded sophisticated law enforcement safety and security measures designed, in part, to curb the proliferation of the defendant's deadly products, which have contributed to the overdose and drug addiction crisis in Puerto Rico and the continental United States and elsewhere.

Further, the defendant and his DTO members have already demonstrated their willingness to undermining the rule of law by corrupting a police officer, paying lookouts, and sending threats to others, including DTO members that have been arrested.  Taken together, these facts demonstrate that releasing the defendant under these circumstances would pose a

24

significant danger to numerous individuals and the community at large. No condition or combination of conditions can assure their safety. As to the rest of the co-defendants charged in the case, the United States submits to the Court that it will await the production of the United States Probation Office's Pretrial Services Report and will address any bail request individually at any bail hearing scheduled by the Court.

The Rest of the Defendants

The United States hereby re-alleges and incorporates by reference herewith the arguments discussed above related to Rodriguez-Sanchez regarding the following factors the Court should consider in determining whether the rest of the defendants should be detained: a) the nature and circumstances of the offenses charged, b) the weight of the evidence, and c) the nature and the danger posed by the defendants' release. The United States also shows the following regarding the defendants' history and characteristics:

A. [1] Rodriguez-Rodriguez: previous arrest for state cases involving crimes against the person, and firearm related charges (October of 2011). Pending federal case in the United States Virgin Islands related to the DTO's operations. While on conditions of release during this case, the United States is in possession of information that he may have engaged in illegal activity. At the time federal agents tried to execute the arrest warrant, a Venezuelan national was found at the premises Rodriguez-Rodriguez was supposed to be at. The Venezuelan national is currently under investigation. Rodriguez-Rodriguez has a history of international travel by vessels and other means.

B.  [3] Gomez-De La Cruz: Dual citizen from both the United States and the Dominican Republic.  Recently involved in a drug transaction in the United States Virgin Islands.

C.  [4] Vidal-Flores: Prior state firearm convictions (2013).  State drug related arrest. Charges dismissed. (2013).

D.  [6] Garcia-Pola: Prior state conviction (Larceny, Illegal appropriation of vehicle)(2009).  Prior state arrests for firearm and domestic violence; cases were dismissed (2006). History of international travel by vessels and other means.

E.  [8] Vazquez-Lopez: Pending federal case in the United States Virgin Islands related to the DTO's operations. History of international travel by vessels and other means.

F.  [9] Aquino-Perales: No prior arrests; however, allegations of abuse of position of trust as a law enforcement officer, based on the pending indictment.  History of international travel by vessels and other means.

G.  [10] Abreu-Cordero: Dual citizen of both the United States and the Dominican Republic.  State firearms arrest and potential conviction.  Prior immigration related arrest and potential conviction.

H.  [12] Hernandez-Diaz: Prior state convictions related to sex offenses.

I.  [16] Zayas-Schulze: Currently considered a suspect in a murder case while on SRT conditions.

J.  [19) Hidalgo-Duarte:  As a result of the events leading to the arrest of four DTO members in November of 2022, charged in the seizure of approximately 104

26

kilograms of cocaine, Hidalgo-Duarte moved to Alaska.  He is dual citizen of both the United States and the Dominican Republic.

K.  [20] Vega-Rivera: Previous state convictions on drug charges (2009).  Prior federal firearms conviction (2015).  The United States is in possession of information indicating that Vega-Rivera has been attempting to contact prior arrestees related to the DTO.

The United States reserves its right to supplement any of the information hereby provided in this memorandum for purposes of any detention hearings.

CONCLUSION

For the foregoing reasons, the United States respectfully submits that the defendants cannot rebut the United States' proof that supports the presumption that "that no condition or combination of conditions will reasonably assure [his] appearance . . . as required and the safety of the community." 18 U.S.C. § 3142(e). Accordingly, the defendants should be detained pending trial.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 21st day of February, 2023.

W. STEPHEN MULDROW
United States Attorney

*/s/ Jorge L. Matos*
Jorge L. Matos – G01307
Assistant United States Attorney
Torre Chardon, Suite 1201
350 Carlos Chardon Street
San Juan, PR 00918
787-766-5656
Jorge.L.Matos2@usdoj.gov

27

**I HEREBY CERTIFY**, that on this date the present document has been filed electronically using selected parties and is available for viewing and downloading by the selected parties from the Court's CFM/ECF system by U.S. Attorney's Office.

/s/ Jorge L. Matos
Jorge L. Matos – G01307
Assistant United States Attorney
Torre Chardon, Suite 1201
350 Carlos Chardon Street
San Juan, PR 00918
787-766-5656
Jorge.L.Matos2@usdoj.gov